[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Navistar, Inc. v. Testa,* Slip Opinion No. 2018-Ohio-1895.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-1895

NAVISTAR, INC., APPELLANT, *v*. TESTA, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Navistar, Inc. v. Testa,* Slip Opinion No. 2018-Ohio-1895.]

R.C. 5751.53—Commercial-activity-tax credit—Board of Tax Appeals ("BTA") properly carried out our instructions on remand—BTA's decision holding that the original valuation allowance reported on taxpayer's Amortizable Amount Report was not in compliance with generally accepted accounting principles affirmed.

(No. 2015-2055—Submitted February 13, 2018—Decided May 16, 2018.)

APPEAL from the Board of Tax Appeals, No. 2010-575.

———————————

**Per Curiam.**

{¶ 1} This case involves the commercial-activity-tax ("CAT") credit prescribed by R.C. 5751.53, and it comes before us for a second time, following our remand in *Navistar v. Testa*, 143 Ohio St.3d 460, 2015-Ohio-3283, 39 N.E.3d 509 ("*Navistar I*"). In *Navistar I*, we concluded that the Board of Tax Appeals

("BTA") had "ignored the testimony of Navistar's experts, an omission that ma[de] the BTA's decision unreasonable and unlawful." *Id.* at ¶ 7. We vacated the decision of the BTA and remanded the cause with the instruction that the BTA "determine, based on a consideration of all the evidence in accordance with [*Navistar I*], whether the valuation allowance originally reported on Navistar's Amortizable Amount Report was or was not in compliance with GAAP" (generally accepted accounting principles). *Id.* at ¶ 40. In its decision on remand, the BTA again upheld the tax commissioner's reduction of Navistar's CAT credit to zero, and Navistar has appealed for the second time.

{¶ 2} In *Navistar I*, we noted that Navistar referred to the CAT credit as part of a "grand bargain" under which Ohio franchise-tax payers such as Navistar would support the enactment of the CAT and would receive a credit that allowed them to "retain[] some portion of the value of their Ohio deferred-tax assets such as NOLs" (net operating losses), which would otherwise be lost when the CAT replaced the former Ohio corporation franchise tax. *Id.* at ¶ 10. The CAT credit consists of "a portion of the Ohio-apportioned NOLs on [the company's] books at the end of [the company's] 2004 fiscal year, which, when adjusted, furnished a total amount of credit that could be used to reduce CAT liabilities over a period of up to 20 years." *Id*. at ¶ 11. Under R.C. 5751.53(A)(9) and (B), this potential credit is referred to as the "amortizable amount." *Navistar I* at ¶ 12. One feature of the amortizable amount that was significant in *Navistar I* and is significant in the present appeal is that in determining the amortizable amount, the NOLs are reduced by a percentage called the valuation allowance, which is an "adjustment dictated by accounting principles that is made on the books from year to year to reflect the likelihood that the company will realize the tax benefit of the NOLs," *id*.

{¶ 3} The factual and procedural background set forth in *Navistar I* is also relevant here. Navistar timely filed its Amortizable Amount Report, and in that report, it applied a valuation allowance of 62.4 percent; the total amortizable

amount reported was $27,048,726. *Id.* at ¶ 15-17. But the letter to the tax department that accompanied the Amortizable Amount Report stated that Navistar was undergoing a "restatement examination of its financial statements for the years 2002, 2003, 2004, and 2005," that "changes [would] occur to the 2002, 2003, and 2004 financial statements as part of [the] examination," and that such changes would impact the report. *Id*. at ¶ 20. In December 2007, a "massive restatement" of the financials for the earlier years was noted in Navistar's annual Form 10-K filed with the Securities and Exchange Commission. As noted in Navistar's Form 10-K, in light of the changes to the underlying financial statements, the restatement of the financials increased the applicable valuation allowance to 100 percent. *Navistar I* at ¶ 17. The tax commissioner adopted the 100 percent valuation allowance in his final determination, which effectively eliminated Navistar's entire CAT credit, *id.* at ¶ 18, and the BTA affirmed the tax commissioner's determination. Navistar appealed the BTA's decision, and in *Navistar I*, we clarified the applicable legal principles and, as mentioned above, we remanded the cause to the BTA for a full consideration of the evidence. Navistar now contends that the BTA failed to properly carry out our instructions on remand. For the reasons set forth below, we disagree.

### The BTA's decision on remand

{¶ 4} In its decision on remand, the BTA took as its starting point the Form 8-K that Navistar filed with the Securities and Exchange Commission on April 6, 2006, which states that "the company's previously issued audited financial statements and the independent auditor's reports thereon for the years ended October 31, 2002 through 2004, and all quarterly financial statements for periods after November 1, 2002 should no longer be relied upon because of errors in such financial statements." The BTA noted that that filing occurred "more than 75 days before [Navistar filed] the June 2006 amortization report with the Tax Commissioner" and that therefore the Amortizable Amount Report itself was filed

in the context of Navistar's own admission that the financial statements that undergirded the reported amortizable amount were unreliable. BTA No. 2010-575, 2015 Ohio Tax LEXIS 4158, *7 (Nov. 30, 2015).

{¶ 5} The BTA found that Navistar's experts, Douglas Pinney and Beth Savage, "reviewed limited information, i.e., not all of Navistar's underlying books and records" and that the testimony of both "reflects only the perception that each valuation allowance, as reported initially and upon restatement, was properly based upon Navistar's books and records, as they existed *at the time of each report's submission*." (Emphasis sic.) *Id*. at *8. The BTA drew the conclusion that "the valuation allowance set forth in the June 2006 report could not have complied with GAAP, because the historical financial information upon which that valuation was based, was unreliable and inaccurate, i.e., not GAAP compliant." *Id.* at *9.

### *The meaning of the term "books and records"*

{¶ 6} Before we consider Navistar's objections to the BTA's findings and its conclusion, we must clarify the term "books and records" as it is used in the BTA's decision. As Pinney, one of Navistar's experts, explained, "[f]inancial statements are derived from the books and records of a company, but the financial statements contain * * * footnote disclosures and other information that is typically not recorded in books and records." Navistar's other expert witness, Savage, testified that "[b]ooks and records would include everything that a company has and maintains to track their transactions." When asked whether "books and records include financial statements," she replied that "it's more accurate to state that the books and records * * * are used to prepare the financial statements."

{¶ 7} Addressing the same subject, the tax commissioner's expert, Ray Stephens, stated that "the books are used to prepare the financial statements and include the financial statements and the records or other qualifying information that are used to prepare the financial statements." Although Stephens testified that from an accounting standpoint, the term "books and records" includes the valuation

4

allowance, because that information is used to prepare the financial statement, the term broadly includes what Pinney characterized as "raw data" or "underlying data." And Pinney articulated the important point that the underlying data "needs to be processed to be useful."

{¶ 8} The foregoing discussion demonstrates why it is important that we first recognize the different ways in which the term "books and records" is used. The term is sometimes used to mean the financial statements and high-level-accounting documents associated directly with preparing the financial statements, and it is sometimes used to mean the "raw data" that forms the factual foundation upon which the high-level-accounting documents and the financial statements are based. Using Pinney's terminology, we will refer to the former types of books and records as the "processed data" and we will refer to the latter types as the "raw data."

{¶ 9} The BTA uses the term "books and records" in both ways. First, the BTA refers to "underlying books and records," which the expert witnesses did not review, 2015 Ohio Tax LEXIS 4158 at *8. This refers to the raw data upon which the processed data, including the financial statements, are based.

{¶ 10} Second, the BTA refers to the books and records as they "existed at the time of each [Form 10-K's] submission." (Emphasis deleted.) *Id.* Here, the BTA is referring primarily to the processed data, which differed at the two points in time because of the restatement of the financials for the fiscal year ending October 31, 2004.

{¶ 11} Likewise, in stating its conclusion that the original valuation allowance was not GAAP compliant, the BTA uses the phrase "historical financial information upon which [the original] valuation [allowance] was based." *Id*. at *9. Here, the BTA is again referring to the processed data, which were shown by the restatement of financials to be "unreliable and inaccurate." *Id.*

**{¶ 12}** The record indisputably supports the BTA's finding that in important respects, the processed data upon which the original valuation allowance was determined were in error. When it filed its Form 8-K in 2006, Navistar proclaimed its financials for 2004 to be unreliable. In 2007, Navistar submitted its long-delayed Form 10-K for 2005, which for the first time "reflect[ed] restated consolidated financial statements for the years ended October 31, 2003 and 2004." The restated financials for those years significantly modified the reported income, expenses, and liabilities that form the basis for projecting whether deferred tax assets could actually be used; for fiscal year 2004, the restatement indicates that the originally reported $311 million net income was incorrect and that the company actually had suffered a $35 million loss.

**{¶ 13}** Supporting the BTA's conclusion that the original valuation allowance was not GAAP compliant are Navistar's own statements in its Form 10-K. In that form, Navistar relies on Financial Accounting Standards No. 109 for the proposition that "an important factor in determining whether a deferred tax asset will be realized is *whether there has been sufficient taxable income in recent years*." (Emphasis added.) And in conjunction with that proposition, Navistar's Form 10-K states that Navistar "reassessed [its] need for a valuation allowance and determined that [it had not applied Financial Accounting Standards] No. 109 properly and that a full valuation allowance should be established for net U.S. and Canadian deferred tax assets based on the weight of positive and negative evidence, particularly our recent history of operating losses." The BTA acted within its discretion in attaching weight to the pronouncements set forth in Navistar's filings with the Securities and Exchange Commission. *See HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 20 ("filings at the Securities and Exchange Commission possess indicia of reliability because they are generated during the course of business for business purposes and involve the assembling of

6

data from business-record sources by persons who have a business duty to assemble such data").

{¶ 14} Of course, even though the processed data were corrected, the underlying raw data remained the same and were in existence at all relevant times. That point was elicited from Pinney on cross-examination. When confronted with the difference between the $76 million valuation allowance originally reported for 2004 and the $2 billion valuation allowance reported in connection with the restated financial statements for 2004, Pinney testified that both valuation allowances were reasonable "at different points in time." The examination proceeded as follows:

> Q: But it's for the same period, you would agree?
>
> A: The— Because the assessment was made at a different point in time, that's why I'm stating it that way.
>
> Q: And it's based upon both— or, based upon information that was in existence as of the fiscal year ending in 2004, correct?
>
> A: Well, not the subsequent period's income and losses. That was not in existence as of * * * 10-31-2004.
>
> Q: I'm * * * talking about information that was utilized to determine the restatement amounts and— as compared to the originally filed amounts.
>
> A: Well, not all of— as I— as I stated, not all of the information, including the changed circumstances that is described elsewhere in the restated financial statement, that— that was not available as of the date the original assessment was made.
>
> Q: *The underlying data for it was available?*
>
> A: *Yes.*

(Emphasis added.) The reference to the "underlying data" in this testimony is, of course, a reference to what we are calling the raw data.

{¶ 15} Expressed in terms of the distinction that we have drawn, the BTA concluded that the original valuation allowance was not GAAP compliant, given that the processed data on which the original valuation allowance was based were defective in certain respects that were material to the calculation of the original valuation allowance. And the essence of the BTA's findings with regard to the testimony of Navistar's experts is that (1) they opined that the valuation allowance was GAAP reasonable in light of the *original* processed data available to those who formulated the original valuation, (2) they did *not* testify that the original valuation allowance was reasonable under the processed data *after restatement*, and (3) they based their opinions on their review of the processed data and *did not themselves review the raw data*.

### The BTA's findings are supported by reliable and probative evidence, and its conclusion is reasonable and lawful

{¶ 16} Against this backdrop, we are now able to evaluate Navistar's objections to the BTA's findings and its conclusion. In doing so, we are mindful that we remanded the cause on a question of fact—whether Navistar's "original valuation allowance was in compliance with GAAP," *Navistar I*, 143 Ohio St.3d 460, 2015-Ohio-3283, 39 N.E.3d 509, at ¶ 7. Accordingly, "[w]e must affirm the BTA's findings of fact if they are supported by reliable and probative evidence," and with respect to "the BTA's determination of the credibility of witnesses and its weighing of the evidence," we perform a highly deferential "abuse-of-discretion review on appeal." *HealthSouth Corp.*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, at ¶ 10.

{¶ 17} First, Navistar maintains that the BTA erred in rejecting Pinney's and Savage's conclusions based on the fact that they had not reviewed all of Navistar's relevant books and records. As Navistar asserts, Pinney's and Savage's

8

review of Navistar's processed data was extensive—and arguably, with respect to processed data, Pinney's review was comprehensive in that he had reviewed what Navistar's auditors relied on when calculating the original valuation allowance. But that does not controvert the BTA's finding that he and Savage did *not* review the *raw data*. Accordingly, Navistar's argument in this regard does not impugn the BTA's decision.

{¶ 18} Second, Navistar advances a legal argument as to why the BTA's reasoning is faulty. Navistar asserts that under *Navistar I*, the BTA "could not use future events to decide whether the 2004 [valuation allowance] was GAAP compliant when it was made." At oral argument, counsel for Navistar stated, "This court, we believe, has said, you do not look at the restatement financials."

{¶ 19} This claim of legal error must be considered in light of what we decided in *Navistar I*. During the first appeal, Navistar argued that "the tax commissioner lacked any authority to adjust the valuation allowance based on the restatement of financial statements that occurred after the June 2006 deadline for filing the Amortizable Amount Report." *See Navistar I*, 143 Ohio St.3d 460, 2015-Ohio-3283, 39 N.E.3d 509, at ¶ 33. We disagreed with this argument. *Id*. at ¶ 34. Indeed, the essential basis for our remanding the cause lay in the possibility that the restated financials, along with the concomitant changed valuation allowance, might indeed establish that the original valuation allowance was *not* GAAP compliant— but in making the determination whether it was or was not GAAP compliant on remand, the BTA needed to take cognizance of the expert testimony that had been offered by Navistar.

{¶ 20} Now the BTA has done so. It found that Navistar's experts did not opine that the original valuation allowance could be deemed GAAP compliant *based on the restated (corrected) financials*. And it has concluded that the evidence before it establishes that the original valuation allowance was not GAAP compliant. Because the very purpose of our remand in *Navistar I* was for the BTA to determine

whether the original valuation allowance was unreasonable in light of all the evidence in the record, including the restated financials, we reject Navistar's claim of legal error.

**{¶ 21}** Third, although the BTA's decision does not explicitly rely on the testimony of the tax commissioner's expert, Stephens, Navistar draws the inference that the BTA tacitly did so. And indeed, Stephens's testimony does support the BTA's conclusion because Stephens opined, based on his own accounting expertise, that in light of the restated financials, the amortizable amount should be reduced to zero because the later valuation allowance was 100 percent. On cross-examination, Stephens testified that the 100 percent valuation allowance as determined by the auditor in connection with Navistar's restated financials was the correct valuation allowance under GAAP. Stephens also expressed his opinion that the original valuation allowance was not GAAP compliant, based on Navistar's own Form 10-K statement to that effect.

**{¶ 22}** Navistar contends that in *Navistar I*, we "disagreed" with Stephens's testimony. Quoting *Navistar I*, 143 Ohio St.3d 460, 2015-Ohio-3283, 39 N.E.3d 509, at ¶ 25, Navistar asserts that we stated that Stephens "inappropriately 'based his opinion concerning the GAAP-compliance of the initial valuation allowance on Navistar's supposed admission that it was not in compliance with GAAP.' "

**{¶ 23}** But Navistar misquotes our decision. We stated that Stephens had based his opinion on various things, including "his accounting knowledge." *Id.* And while we described the connection between Stephens's opinion and the admission set forth in Navistar's Form 10-K, we never stated that that connection was in any way "inappropriate."

**{¶ 24}** Equally misguided is Navistar's allegation that the BTA was "hypocritical" in relying on Stephens's testimony when it had rejected that of Pinney and Savage based on their having failed to review all of Navistar's books and records. Navistar alleges that this was hypocritical because Pinney and Savage

had reviewed more processed data than Stephens had. In fact, although he did not review as many processed data, Stephens did review the reported financial statements and notes, and his opinion regarding GAAP compliance reflects the application of his own expertise to the matter. The BTA was entitled to accord whatever weight to that opinion that it deemed appropriate.

**{¶ 25}** Navistar additionally argues that Stephens's opinion testimony is "irreparably damaged" by the fact that Stephens also took into consideration the complaint filed by Navistar against its former accountants in Illinois. Namely, Navistar characterizes any reliance by Stephens on the Illinois complaint as "impermissible" in light of our holding in *Navistar I* that the tax commissioner had waived his objection to the BTA's having ruled that statements in the complaint would not be considered as admissions by Navistar. 143 Ohio St.3d 460, 2015-Ohio-3283, 39 N.E.3d 509, at ¶ 37-39.

**{¶ 26}** This argument is without merit. As we noted in *Navistar I*, the hearing examiner "admitted the complaint as evidence but rejected the tax commissioner's argument that it constituted admissions against interest or statements by a party opponent," and the hearing examiner "limited the tax commissioner's use of the complaint in examining witnesses." *Id.* at ¶ 37. We construed this as a "ruling that precluded the use of the Illinois complaint as an admission." *Id*. at ¶ 38. Under Evid.R. 703, an expert may rely on facts "perceived by the expert *or admitted in evidence at the hearing*." (Emphasis added.) Although the BTA ruled that the complaint would not itself be construed as an admission, the complaint was admitted into evidence. As a result, Stephens could properly rely on it under the evidentiary rules, which provide guidance at the BTA but are not controlling. *See Plain Local Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 130 Ohio St.3d 230, 2011-Ohio-3362, 957 N.E.2d 268, ¶ 20.

**{¶ 27}** Fourth, Navistar argues that in reviewing the expert and lay testimony of Navistar's witnesses, the BTA should have come across evidence

establishing that the restated financials were based not only on raw data in existence at the time Navistar filed its Amortizable Amount Report but also on information that became available only after the report was filed. For example, Navistar argues, although the raw data were available at all relevant times, the restated financials for fiscal year 2004 that Navistar submitted to the Securities and Exchange Commission in 2007 incorporated insight from later accounting periods when Navistar had concluded that it had a 100 percent valuation allowance.

{¶ 28} We discern no reversible error in this regard. For one thing, Pinney testified—as previously discussed—that the "underlying data" was in fact in existence at the relevant times. Additionally, the pronouncements by Navistar in its Form 10-K and Stephens's testimony furnish a sufficient basis for the BTA's conclusion, even if some factors were considered in the restated financials that were not in existence at the time the Amortizable Amount Report was filed—quite simply, the BTA could reasonably have concluded, based on the exercise of its discretion as the finder of fact, that the influence of such other factors was inconsequential.

{¶ 29} Also unavailing is Navistar's contention that the subsequent history of Navistar's actually realizing the value of net operating losses that accrued in earlier years establishes the propriety of the original *partial* valuation allowance for fiscal year 2004 as opposed to the later *total* valuation allowance. To accept this contention would violate the precept that we articulated in *Navistar I*: the tax commissioner may adjust the amortizable amount on audit but only to cure an inaccuracy or correct an error in the report of the amortizable amount. *Id*. at ¶ 34. The issue before the BTA was the reasonableness of the valuation allowance in light of the corrected financial statements with respect to the fiscal year ending in 2004, and events that occurred in subsequent years cannot retroactively justify a lesser valuation allowance if that lesser valuation allowance was unwarranted in

light of the information properly considered in determining the valuation allowance for fiscal year 2004.

### Conclusion

**{¶ 30}** In *Navistar I*, we held that the BTA's "ignor[ing] the testimony of Navistar's experts" was an omission that "ma[de] the BTA's decision unreasonable and unlawful." 143 Ohio St.3d 460, 2015-Ohio-3283, 39 N.E.3d 509, at ¶ 7. In its decision on remand, the BTA explained why Navistar's expert testimony did not demonstrate that the original valuation allowance was GAAP compliant. Thus, the BTA carried out our instruction on remand, and because its decision is reasonable and lawful, we affirm it.

Decision affirmed.

O'CONNOR, C.J., and O'DONNELL, FRENCH, DEWINE, and DEGENARO, JJ., concur.

KENNEDY and FISCHER, JJ., dissent.

_____

Maryann B. Gall; and Vorys, Sater, Seymour & Pease, L.L.P., Anthony L. Ehler, and Steven L. Smiseck, for appellant.

Michael DeWine, Attorney General, and Barton A. Hubbard, Assistant Attorney General, for appellee.

_____